IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Honorable Marcia S. Krieger

Civil Action No. 10-cv-01719-MSK-KLM

MISTI LEE SCHNEIDER,

      Plaintiff,

v.

THE CITY OF GRAND JUNCTION POLICE DEPARTMENT, an agency of The City of Grand Junction;
BILL GARDNER;
JOHN CAMPER;
WILLIAM D. BAKER;
JOHN A. ZEN;
RICK DYER; and
JOHN AND JANE DOES 3 to 10, in their official and individual capacities,

      Defendants.

---

**(AMENDED)[1] OPINION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**

---

**THIS MATTER** comes before the Court on the Defendants' Motion for Summary Judgment (**#85**), to which Plaintiff Misti Lee Schneider responded (**#101**), the Defendants replied (**#109**), and Ms. Schneider filed a surreply (**#112**). Also presented is the Defendants' Motion to Seal (**#108**), which is apparently unopposed. Having considered the same, the Court **FINDS** and **CONCLUDES** the following.

## I. Background

In this action, the Plaintiff asserts claims under 42 U.S.C. § 1983 for violation of her

---

[1]This amendment corrects typographical errors and removes an empty footnote contained in the original version of the order. No substantive changes are made.

Fourteenth Amendment right to substantive due process as a result of a sexual assault by Glenn

Coyne, who was a police officer employed by the Grand Junction, Colorado, Police Department

("Police Department").  The claims against the individual Defendants are based on supervisory

liability theories for their alleged inadequate hiring, training, supervision, and discipline of

Officer Coyne and against the City of Grand Junction (the "City") under a municipal liability

theory for the same alleged failures.  The Defendants move for summary judgment on the

grounds that the evidence is insufficient to establish a *prima facie* case of municipal or

supervisory liability for Officer Coyne's conduct.

## II.  Material Facts

Viewed in the light most favorable to Ms. Schneider as the non-movant, the Court finds

that the evidence presented shows the following:

## A.    The Underlying Incident

### 1.    911 Call and Officer Response

Ms. Schneider was a resident of Grand Junction, Colorado during the relevant time

period.  She was in the process of divorcing her husband.  On September 27, 2009, she called

911 to her home because her teenage son was out of control.  Officer Coyne and another Grand

Junction police officer responded to the call and arrived at the Schneider home around 7 p.m.

While at the house, the officers discovered bomb-making materials in the shed behind the home.

The officers spent the evening at the Schneider home interviewing Ms. Schneider and her son

and collecting evidence.

Among the evidence collected was a video taken by Ms. Schneider's son on his cell

phone.  Ms. Schneider helped to download the video to a SIM card.  Because it took sometime to

2

download the information, Officer Coyne left and returned to pick it up around 9:00 p.m.

Officer Coyne returned to Ms. Schneider's home a second time that night, approximately two hours later.  He explained that he needed to retrieve the cell phone because the police had been unable to access the video from the SIM card without it.  After retrieving the telephone, Officer Coyne returned to Ms. Schneider's home yet a third time, around midnight, to return a box of Ms. Schneider's property unrelated to the case that had been taken by mistake.

The next day, September 28, 2009, Ms. Schneider placed a series of calls to the Police Department, the District Attorney's office and Officer Coyne about the serious charges that her son could be facing.  Officer Coyne called her mid-afternoon with questions relating to the investigation.  During the call, he asked Ms. Schneider if she wanted him to come by and talk; she said she would appreciate that.  Ms. Schneider left additional voice mail messages on Officer Coyne's voice mail later in the day.  He returned her call around 8 p.m, and again asked if she would like him to stop by and talk about her son and the investigation of the case.  She again answered affirmatively.

### 2.    The Assault

At around midnight that night, or early morning September 29, 2009, while Ms. Schneider was doing some cleaning and packing at her home, Officer Coyne paid her a visit.[2] He entered her home through an unlocked door without knocking or requesting permission.  Ms. Schneider stated that she suddenly saw him in her kitchen.  He was not in uniform, although he

---

[2]Although Officer Coyne was scheduled to work until 1 a.m. that day, he was given permission to leave early.  His last dispatch entry was at 11:49 p.m., which stated "unit off duty." There is no evidence that anyone at the Police Department was aware that Officer Coyne intended to go to Ms. Schneider's home after leaving work.

may have still been wearing his uniform trousers and/or boots. He did not appear to have a gun, badge, or police utility belt.  Ms. Schneider asked him, "Aren't you supposed to be at work?"  In response, he said something to the effect that his boss would "cover for him."

He began talking with Ms. Schneider about her son and the case.  She offered him coffee and they discussed the investigation.  Officer Coyne then turned the conversation to Ms. Schneider's personal life. He hinted that he had obtained information about Ms. Schneider's husband from his police connections, then asked Ms. Schneider more personal questions and commented on her appearance.  He attempted to kiss her.  She resisted but he physically overpowered her, and forcibly sexually assaulted her, vaginally and anally.

The next day, Ms. Schneider informed a friend of what happened.  She was taken to the hospital and she reported the assault to a Sheriff's Deputy with the Mesa County Sheriff's Office ("Sheriff's Office").  Medical examination revealed trauma consistent with her account of the incident.  The Sheriff's Office began a criminal investigation and advised the Police Department of the allegations.  As a part of that investigation, Ms. Schneider participated in two pretext phone calls to Officer Coyne, during which Officer Coyne denied that anything other than consensual sexual relations had occurred.

Officer Coyne's employment was terminated and he was arrested on October 1, 2009. He committed suicide on or around October 6, 2009.

**B.     Other Incidents, Investigations & Discipline**

**1.     Officer Coyne**

Officer Coyne was hired at the Police Department in January 2007.  On December 28, 2008, the Police Department received a complaint from a female resident of Grand Junction,

Valentina Whyte-Begay,[3] who claimed that Officer Coyne sexually assaulted her on December 19, 2008.

According to Ms. Whyte-Begay's complaint, she first met Officer Coyne on November 20, 2008 after she drove to the police department under the influence of alcohol. Officer Coyne took her to a mental health/detox facility, then to a medical hospital and followed up with her in several telephone calls. While off-duty On December 19, 2008, Officer Coyne responded to Ms. Whyte-Begay's telephone call by dropping by her home. Ms. Whyte-Begay invited him in. They had consensual vaginal sexual intercourse. When Ms. Whyte-Begay declined to participate in anal intercourse, Officer Coyne assaulted her.

Upon receipt of Ms. Whyte-Begay's complaint, Deputy Chief John A. Zen requested that the Sheriff's Department conduct a criminal investigation.[4] Officer Coyne was placed on administrative leave pending the outcome of the criminal and internal affairs investigations.

Sgt. Henry Stoffel of the Sheriff's Department conducted the investigation. He interviewed Officer Coyne twice, interviewed Ms. Whyte-Begay, interviewed Ms. Whyte-Begay's son and daughter and the nurse who examined Ms. Whyte-Begay after the incident. The nurse advised Sgt. Stoffel that Ms. Whyte-Begay's injuries could be consistent with her version of events, but could also be consistent with other explanations. Other physical evidence also was not conclusive. Officer Coyne underwent a polygraph examination, the results of which were

---

[3]Ms. Whyte-Begay has submitted an affidavit in support of Ms. Schneider's Response to Motion for Summary Judgment and so has elected to participate in this litigation. Exh. 2 to Response, **#101-5**. In the absence of any pending motion to seal or other attempt to maintain confidentiality, her identity and the details of her assault are revealed in this order.

[4]It is standard procedure to have the Sheriff's Department conduct investigations regarding city employees.

interpreted as showing no deception with regard to Ms. Whyte-Begay's allegations.  There was evidence that Ms. Whyte-Begay was an alcoholic, described as spiraling out of control at the time, although her son informed Sgt. Stoffel that Ms. Whyte-Begay was not drunk on the evening of the assault.  Sgt. Stoffel personally believed that Ms. Whyte-Begay was credible and that Officer Coyne was not.  Sgt. Stoffel turned over the investigation results to the District Attorney's office, which declined to prosecute a case due to the inconclusive physical evidence, the polygraph result, and Ms. Whyte-Begay's potential credibility problems.

An internal affairs investigation of Officer Coyne was held in abeyance pending the outcome of the criminal investigation.  Upon the conclusion of the criminal investigation, the internal affairs investigation was conducted by Professional Standards[5] Administrator ("PSA") Rick Dyer.  PSA Dyer was in communication with Sgt. Stoffel throughout the criminal investigation and present at several of the interviews, but not at any interview of Ms. Whyte-Begay.  PSA Dyer reviewed the entire criminal file and interviewed Officer Coyne, but did not interview Ms. Whyte-Begay.  Ms. Whyte-Begay's background was investigated.  As to Officer Coyne, however, PSA Dyer reviewed only the background information compiled at the time Officer Coyne was hired.  PSA Dyer summarized the results of the internal affairs investigation in a report and submitted it over to Chief of Police, Bill Gardner.[6]

At this time, Officer Coyne had no other significant disciplinary record and the Police

---

[5]The Professional Standards Unit is an independent administrative unit in the Department that reports directly to the Chief of Police.  It is responsible for training, recruitment, personnel, internal affairs investigations, and other administrative matters.

[6]Chief Gardner left the position in early September 2009 and was replaced by Interim Chief John Camper, who was in charge when Ms. Schneider filed her complaint.

Department had no indication that he had engaged in similar conduct on any prior occasion.
Chief Gardner decided that Officer Coyne should be sanctioned for engaging in conduct
unbecoming to a police officer and for failing to obey all City and Department regulations.
Chief Gardner considered termination of Officer Coyne's employment, but ultimately disciplined
Officer Coyne with reduction to  probationary status for six months and a 10% reduction in pay.

Pursuant to the Police Department's formal and informal policies, the details of the
investigation and complaint were kept confidential.  Officer Coyne was assigned a new
supervisor upon his return from administrative leave.  His new supervisor, Defendant Sergeant
William Baker, was aware that Officer Coyne had been placed on administrative leave and
probationary status, but was not informed of the reasons or of Ms. Whyte-Begay's allegations.

Approximately a week before the incident with Ms. Schneider, Officer Coyne informed
Sgt. Baker that he was receiving what he believed to be inappropriate voice mail messages from
a woman he had encountered through his official duties.  The woman appeared to be seeking to
initiate a personal relationship with Officer Coyne.  Sgt. Baker requested the voice mails be
forwarded to him with the apparent intent of advising the woman to discontinue contact with
Officer Coyne on non-work related matters.

## 2.    Other Officers

One other Grand Junction police officer has been accused of or investigated for non-
consensual sexual conduct.  A complaint was received that on July 10, 2009 Officer Z[7] gave a

_____

[7]The Defendants have moved to seal portions of the briefs and exhibits concerning
internal affairs investigations of other officers as these matters concern third parties not involved
in this litigation whose privacy interests should be maintained.  As discussed below, because the
identities of these individuals is not material to the resolution of the matters in this litigation, the
names of the officers investigated for misconduct are not included.

female citizen a ride home when he observed her walking down the street in an intoxicated state. The woman alleged that the officer took her to her home and then escorted her in.  The woman fell asleep on her couch, but she woke up a few minutes later to discover the officer touching her breasts.  She ran to a neighbor's home and contacted the police.  Officer Z was placed on administrative leave and a criminal investigation was commenced.  Shortly thereafter, he was charged with crimes involving domestic violence and he resigned before any further disciplinary action was taken.

There is also evidence that two other Grand Junction police officers were involved in improper consensual sexual relationships.  One officer had engaged in an extra-marital affair in 2007 with the wife of another law enforcement officer.  He had another extra-marital relationship 2008; in November 2008, the husband of that woman threatened to kill himself and his wife and the officer, resulting in a short standoff with the Sheriff's Office.  The officer was disciplined with a suspension and placement on probation for six months.  He ultimately resigned in 2010 in lieu of an internal investigation following allegations that he was sending sexually explicit emails from his personal account.  A second officer had a consensual relationship with the wife (or possibly ex-wife) of a man who had been arrested by the Police Department.

**C.**   **Hiring, Supervision, Training**

**1.**   **Hiring and Background Check**

Officer Coyne served in the United States Marine Corps from 1992 to 1996.  He then went to college and was employed between July 1999 and October 2001 as a deputy with the Sheriff's Office of Santa Rosa, Florida.  From October 2001 to November 2002, he was employed as a police officer with the Florida Department of Environmental Protection.  He then

returned to the Santa Rosa Sheriff's Office where he worked from November 2002 to February 2006. Thereafter, he moved to Colorado and worked for the Mesa County Sheriff's Office as a deputy from February 2006 to January 2007, before being hired by the Grand Junction Police Department.

The hiring process for Officer Coyne began with the submission of an application, supplement form and personal history statement. Pursuant to municipal policies, he participated in a pre-employment suitability interview and psychological screening. These examinations generally showed him to be suitable for hire; however, in a section entitled "Areas of Concern and Recommendations for Further Investigation," the psychological report identified the following issues: Officer Coyne's ability to get along with coworkers and supervisors, ability to establish and maintain cohesive work relationships in group-oriented environments, ability to accept supervision in a neutral and constructive manner, ability to adapt to change quickly and efficiently, and ability to assert himself effectively. The examiners suggested that these areas be further investigated during his background check.

Officer Coyne was interviewed by an oral board, and he underwent physical examinations. On November 14, 2006 he submitted to a Computerized Voice Stress Analysis examination, a type of lie detector test, which noted no indications of deception. He was given a conditional offer of employment on November 14, 2006, while the background check and hiring process were pending.[8]

The background check included two competed verification forms from Officer Coyne's

---

[8]PSA Dyer is responsible for the hiring process in general but the background check of Officer Coyne was conducted by Sgt. David Krouse.

personal references who supplied positive recommendations.  Criminal and traffic records check requests were sent to Officer Coyne's Florida employers.  Employment verification was received from the Florida Department of Environmental Protection, but no other information was provided due to confidentiality restrictions.  The background check revealed no warrants or arrests of Officer Coyne in Florida or Colorado.  Sgt. David Krouse of the Grand Junction Police Department also interviewed three supervisors at the Mesa County Sheriff's Office and one supervisor at the Santa Rosa Sheriff's Office.  All provided positive recommendations, although one coworker in the Mesa County Sheriff's Office told Sgt. Krouse that Officer Coyne had a tendency to come into volatile situations that had been calmed down and "fire people back up."  Sgt. Krouse reviewed Officer Coyne's personnel file at the Mesa County Sheriff's Office, which revealed no negative information.  In addition, he conducted a home visit with Officer Coyne and his wife.

Because Officer Coyne passed his pre-employment tests, examinations, and background check, the Police Department extended him a job offer on December 27, 2006 and he began working on January 15, 2007.  The hiring decision was made by Chief Gardner.

After the Police Department's background check was completed and the hiring decision made, the Mesa County Sheriff's Office received a complaint about Officer Coyne that had been made on January 10, 2007.  A woman, Amelia Lyon[9], alleged that on January 8 (the last day of Officer Coyne's employment with the Sheriff's Office), he had subjected her to a potentially illegal strip search and groped her during a police raid.  The Sheriff's Office did not investigate

---

[9]Ms. Lyon has also submitted an affidavit in support of Ms. Schneider's Response (Exh. 3, **#101-6**) and has not sought to keep the details of her interaction with Officer Coyne confidential.

the complaint nor inform the Police Department of these allegations. Indeed, the Police Department did not learn of this information until after Ms. Schneider complained.

The background check also did not reveal that while Officer Coyne was with the Florida Department of Environmental Protection, he was investigated for "conduct unbecoming a public employee" but the complaint was "not sustained." Apparently, the Florida Department of Environmental Protection had refused to provide Officer Coyne's records to the Police Department at the time of the background check. There is no evidence that this disciplinary investigation involved any type of sexual misconduct; indeed, there is no information at all about the allegations underlying the complaint.

### 2.      Policies Governing Police Conduct and Personnel Matters

The Police Department has a Code of Conduct, which prohibits abuse of police power by officers regardless of whether they are on or off duty. The Code also prohibits conduct that reflects unfavorably on the Police Department or the City. There are also provisions that prohibit sexual harassment. The Department has formal training policies, including required annual training of officers and additional training as needed.

There are also extensive policies governing complaint procedures and internal investigations. Under the policy, a complaint involving "credible allegation(s) of criminal conduct, on or off duty, by an employee; or allegations of egregious policy violations, such as . . . sexual harassment or abuse of official position" is considered a "Category I" complaint, which automatically triggers an internal affairs investigation.

Internal affairs investigations are kept confidential pursuant to policy, with information was released only on a "need to know" basis, as decided by the Chief of Police. The policies

anticipate that once an internal affairs investigation is completed, a "Command Staff Review" is conducted.[10]  A Command Staff Review is a procedure whereby all command staff one or more ranks above the affected employee, the internal affairs investigator, the employee's supervisor, and a second supervisor review and discuss the investigation report and supporting documentation and assist in determining appropriate discipline.  However, the Department customarily did not conduct Command Staff Reviews in cases in which the allegations concerned sensitive or sexually related matters in order to preserve confidentiality.  No Command Staff Review was conducted with respect to the investigation of Ms. Whyte-Begay's complaint against Officer Coyne.

The Police Department also has policies governing supervision of officers.  There is an established chain of command and designation of supervisory responsibilities.  Officer performance is purportedly tracked on an on-going basis, which includes feedback from members of the community.  As part of his sanction for his involvement with Ms. Whyte-Begay, Officer Coyne was supposed to be subject to "intense supervision" while on probationary status, but his direct supervisor testified in his deposition that he was unaware of any need for heightened supervision of Officer Coyne.

## C.    Post-Incident Conduct

Notwithstanding Officer Coyne's suicide, the Sheriff's Department conducted a criminal investigation of Ms. Schneider's complaint.  In connection with this, the Sheriff's Department investigated whether Ms. Schneider had truthfully reported the circumstances under which

---

[10]It is somewhat unclear whether a Command Staff Review is required or optional but construing the evidence in Ms. Schneider's favor, the Court finds for the purpose of summary judgment that it was required.

Officer Coyne entered her home.[11]   Some inconsistencies were noted in her account but no criminal charges were filed against her for false reporting.  The Sheriff's Department shared information about this investigation with the Police Department.

In November 2009, Chief Camper instructed PSA Dyer to check the Police Department's records to determine how many times previous to the incident the Police Department had contacts with Ms. Schneider or her family.  Apparently, the police had been called to the Schneider home approximately 30 times before the call involving Officer Coyne.  PSA Dyer also looked into whether Officer Coyne had ever previously been in contact with Ms. Schneider but found no evidence that Officer Coyne had previously been sent to Ms. Schneider's home on a call.

### III.  Standard of Review

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary.  *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995).  Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Substantive law governs what facts are material and what issues must be determined.  It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989).  A factual

---

[11]Ms. Schneider states in an affidavit that unrelated criminal charges have been brought against her, which she believes occurred because of complaint.  Ms. Schneider has not brought a claim of vindictive prosecution or retaliation and offers no evidence, only speculation, in support of her assertion.  Therefore, these matters are not considered in this analysis.

dispute is "genuine" and summary judgment is precluded if the evidence presented in support of

and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter

for either party. *See Anderson*, 477 U.S. at 248. When considering a summary judgment

motion, a court views all evidence in the light most favorable to the non-moving party, thereby

favoring the right to a trial. *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir.

2002).

When the moving party does not have the burden of proof at trial, it must point to an

absence of sufficient evidence to establish the claim or defense that the non-movant is obligated

to prove. If the respondent comes forward with sufficient competent evidence to establish a

*prima facie* claim or defense, a trial is required. If the respondent fails to produce sufficient

competent evidence to establish its claim or defense, the claim or defense must be dismissed as a

matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

## IV. Analysis

### A.    Elements of a Section 1983 Claim

Section 1983 provides that "[e]very person who, under color of any statute, ordinance,

regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or

causes to be subjected, any citizen of the United States or other person within the jurisdiction

thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and

laws, shall be liable to the party injured in an action at law, suit in equity, or other proper

proceeding for redress . . ." The statute creates no substantive civil rights, only a procedural

mechanism for enforcing existing constitutional and other federal rights. *Wilson v. Meeks*, 52

F.3d 1547, 1552 (10th Cir. 1995). Therefore, to assert a claim under section 1983, a plaintiff

14

must show as a threshold matter (1) that a right secured by the Constitution and laws of the United States was violated and (2) that a person acting under color of state law deprived the plaintiff of the right. *Hall v. Witteman*, 584 F.3d 859, 864 (10th Cir. 2009).

As to the first element, Ms. Schneider contends that Officer Coyne's assault was a violation of her substantive due process right to bodily integrity guaranteed by the Fourteenth Amendment. *See Williams v. Berney*, 519 F.3d 1216 (10th Cir. 2008) ("due process protections are accorded primarily 'to matters relating to marriage, family, procreation, and the right to bodily integrity.'").

As to the second element, she asserts that Officer Coyne acted under color of law. The "under color of state law" requirement is "a jurisdictional requisite for a § 1983 action." *Polk County v. Dodson*, 454 U.S. 312, 315 (1981). "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *West v. Atkins*, 487 U.S. 42, 49 (1988) (citation omitted). Purely private conduct by state employees that is not "fairly attributable" to the state does not satisfy the "color of law" requirement. *Jojola v. Chavez*, 55 F.3d 488, 492 (10th Cir. 1995) (citation omitted). Therefore, "there must be 'a real nexus' between the employee's use or misuse of their authority as a public employee, and the violation allegedly committed by the defendant." *Id*. at 493. The public employee's authority may be apparent as well as actual. *Id*.

If these two elements are satisfied, there is a cognizable claim against Officer Coyne. However, a claim against Officer Coyne does not automatically result in liability for his supervisors or the governmental entity for which he worked. *Brown v. Montoya*, 662 F.3d 1152

(10th Cir. 2011) (there is no *respondeat superior* liability under § 1983, only liability based on

personal involvement in the alleged constitutional violation) (citation omitted).  Ms. Schneider

contends that supervisory and municipal liability follow from the Defendants' inadequate hiring,

discipline, training, and supervision of Officer Coyne, which resulted in her constitutional injury.

As the plaintiff in this action, Ms. Schneider has the burden of proof by the preponderance of the

evidence to establish each of the elements of the claim asserted against each Defendant, set forth

below.  The Defendants challenge the Plaintiff's ability to prove the elements of the underlying

claim as well the claims particularly asserted against each defendant.[12]

### 1.      Individual Defendants - Supervisory Liability

When an official is sued under § 1983 for conduct "arising from his or her superintendent

responsibilities," the plaintiff must demonstrate not only that a subordinate employee violated

her rights but that the supervising official "by virtue of his own conduct and state of mind did so

as well."  *Dodds v. Richardson*, 614 F.3d 1185, 1197 (10th Cir. 2010) (citing *Ashcroft v. Iqbal*,

556 U.S. 662 (2009)).

---

[12]In addition, the individual Defendants assert the defense of qualified immunity.  The doctrine of qualified immunity protects government officials who perform discretionary government functions from personal liability for civil damages and the obligation to defend the action.  *See Johnson v. Fankell*, 520 U.S. 911, 914 (1997); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  When a defendant raises a qualified immunity defense, the burden shifts to a plaintiff to satisfy a two-part test.  *See Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Green v. Post*, 574 F.3d 1294, 1300 (10th Cir. 2009).  A plaintiff must show that he or she had a constitutional right that was infringed (the "violation prong"), and that such right was clearly established at the time of the alleged infringement (the "clearly established prong").  Although a plaintiff must ultimately establish both elements to avoid application of the doctrine, the Court has discretion to consider the prongs in the test in any order.  *See Pearson v. Callahan*, 129 S.Ct. 808, 818 (2009); *Green*, 574 F.3d at 1299.  Therefore, to overcome the individual Defendants' qualified immunity defense, Ms. Schneider must establish both that each Defendant personally violated her constitutional rights and that the right was clearly established.

To carry her burden of proof against the individual defendant supervisors, Ms. Schneider must come forward with evidence sufficient to establish: (1) that the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation. *Id.*, 614 F.3d at 1199. The state of mind required for supervisory liability is the same as that for the underlying constitutional offense. *Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010) ("the *mens rea* required of [a supervisor] to be held liable . . . can be no less than the *mens rea* required of anyone else."). Because Officer Coyle's assault on Ms. Schneider would be considered a deprivation of her substantive due process rights, the parties agree that the applicable state of mind for such a violation is "deliberate indifference." *Green v. Post*, 574 F.3d 1294, 1301 (10th Cir. 2009)[13].

To establish causation in the context of a supervisor's liability for the acts of a subordinate, a plaintiff must show that "the defendant set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights." *Snell v. Tunnell*, 920 F.2d 673, 700 (10th Cir. 1990) (quoting *Conner v. Reinhard*, 847 F.2d 384, 396-97 (7th Cir.)).

With respect to the culpable mental state, deliberate indifference, a plaintiff must come

---

[13]"The 'ultimate' standard for determining whether there has been a substantive due process violation is whether the challenged government action shocks the conscience of federal judges.'" *Graves v. Thomas*, 450 F.3d 1215, 1220 (10th Cir. 2006) (citation omitted). Deliberate indifference may shock the judicial conscience depending on the facts and circumstances of the situation and appears to be the standard applied "when actual deliberation is practical." *Green*, 574 F.3d at 1300-1301(quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 851 (1998)). Because the challenged policies are the result of deliberation, deliberate indifference sufficient to shock the judicial conscience appears to be the appropriate standard.

forward with evidence sufficient to show that Defendant "knew his actions created a substantial risk of constitutional injury." *Dodds*, 614 F.3d at 1205; *see also Green*, 574 F.3d at 1303 (deliberate indifference in substantive due process context "encompasses conscious, deliberate indifference to an extreme risk of very serious harm to the plaintiff" or someone in the plaintiff's position). It is well established that this requires a showing of culpability beyond mere negligence. *Uhlrig v. Harder*, 64 F.3d 567, 573 (10th Cir. 1995) (the due process clause "is not a guarantee against incorrect or ill-advised [government] decisions" and therefore "a substantive due process violation must be more than an ordinary tort to be actionable under § 1983") (citation omitted).

### 2.    Municipal Liability

As to the City, Ms. Schneider must establish the existence of a municipal "policy" or "custom" that caused her injury. *Dodds,* 614 F.3d at 1201-2 (citing *Monell v. Dep't of Social Serv.*, 436 U.S. 658 (1978)). She must also show that the city acted with the requisite state of mind in the promulgation of that policy or custom. *Id*. at 1202. Under well-established principles governing municipal liability, "deliberate indifference" is also the appropriate standard when a plaintiff asserts that the alleged custom or policy comprised a failure to act. *Jenkins v. Wood*, 81 F.3d 988, 994 (10th Cir. 1996) (citation omitted).

With respect to causation, a liability results only "when the official policy is the 'moving force' behind the injury alleged." *Barney v. Pulsipher*, 143 F.3d 1299, 1307 (10th Cir.1998) (quotation omitted). Therefore, a plaintiff must show "a direct causal link between the municipal action and deprivation of federal rights." *Id*. (quotation omitted).

To establish the deliberate indifference element, in the context of an alleged municipal

failure to adequately train or hire or supervise, a plaintiff must demonstrate that the need for

more or different action was "so obvious, and the inadequacy so likely to result in the violation

of [the plaintiff's due process] rights, that the policymakers of the [governmental entity] can

reasonably be said to have been deliberately indifferent to the need" for additional action.

*Porro*, 624 F.3d at 1328 (quoting *Jenkins*, 81 F.3d at 994); *see also Barney*, 143 F.3d at 1307

(deliberate indifference may be demonstrated "when the municipality has actual or constructive

notice that its action or failure to act is substantially certain to result in a constitutional violation,

and it consciously or deliberately chooses to disregard the risk of harm.").  A plaintiff does not

carry his or her burden by showing "general deficiencies" but rather must "identify a specific

deficiency that was obvious and closely related to his [or her] injury . . .  so that it might fairly be

said that the official policy or custom was both deliberately indifferent to his constitutional rights

and the moving force behind his injury."  *Porro*, 624 F.3d at 1328 (citations and internal

punctuation omitted).

## B.      Existence of a Constitutional Injury

The Defendants first contend that the evidence is insufficient to establish an underlying

constitutional injury because Ms. Schneider cannot prove an essential element of a 42 U.S.C. §

1983 claim-- that Officer Coyne acted under "color of law."

The evidence here shows that although Officer Coyne may have been technically off-

duty and not carrying any of the insignia of his position (uniform, badge, equipment), at the time

he went to Ms. Schneider's home, he purported to be there in the course of and in furtherance of

the investigation of Ms. Schneider's son.  His actions that night were similar to those the night

before, in that he arrived unannounced fairly late at night to further the investigation.  He had

arranged to meet Ms. Schneider at some point for the purpose of discussing her son's case, although Ms. Schneider assumed that the discussion would occur during normal business hours. The fact that he entered without permission might weigh against finding that he appeared to be acting pursuant to his official duties; nonetheless, a reasonable jury could also find that Ms. Schneider permitted him to remain on the premises (or did not attempt to escape or call the police) because she believed he was acting in the capacity of a police officer rather than as an intruder.  *See Whitney v. State of N.M.*, 113 F.3d 1170, 1174 (10th Cir. 1997) (quoting with approval *Dang Vang v. Vang Xiong X. Toyed*, 944 F.2d 476, 480 (9th Cir.1991), where Ninth Circuit found that defendant had used "his government position to exert influence and physical control over these plaintiffs in order to sexually assault them.").

This evidence is sufficient for a jury to find that Officer Coyne's ability to assault Ms. Schneider was the result of his "badge" of state authority and satisfies Ms. Schneider's *prima facie* burden regarding the color of law element.[14]  Therefore, summary judgment on this basis is not appropriate.

## C.     Municipal and Supervisory Liability for Allegedly Deficient Policies

Turning to the claims against the individual Defendants and the City on the merits, the question is whether Ms. Schneider's evidence is sufficient to establish all the elements of a *prima facie* claim against each Defendant.  The Defendants contend that the evidence is insufficient as to two elements that are common to claims against the City and the individuals:

---

[14]Ms. Schneider alternatively argues that even if Officer Coyne did not act under color of law, she can still state a claim against the Defendants.  Because the Court concludes that Ms. Schneider's evidence is sufficient to establish the elements of an underlying constitutional violation for a section 1983 claim, it declines to consider these alternative theories.

(1) a causal connection between any City or Department policy, whether formal or informal, and Officer Coyne's unlawful acts; and (2) culpable state of mind (for the individual Defendants) or deliberate indifference (for the City).

Ms. Schneider asserts that several different Defendants are responsible for the implementation or promulgation of the subject policies, and that these policies are also attributable to the City as an official municipal policy or practice. Because Chief Gardner (and thereafter Interim Chief Camper) was the ultimate policymaker for the City regarding the Police Department, his decisions and his ratification of the decisions of authorized subordinates can amount to a municipal policy as well as an action taken in his capacity as a supervisor. *Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010). However, the primary issues in this analysis pertain to the other key elements (causation and culpable state of mind/deliberate indifference); therefore, the Court will assume, without deciding, that the actions of the identified Defendants amount to a policy that could underlie a claim as to either the individual Defendant or the City. The Court now turns to each identified alleged inadequate practice or faulty decision to determine whether the evidence is sufficient to demonstrate the remaining elements of liability.

1.      **Hiring** (asserted against PSA Dyer, the City)

The evidence demonstrates that the hiring of Officer Coyne was generally in compliance with the City and the Police Department's hiring policies. He was subjected to and passed numerous examinations, including lie detector and psychological tests, and a thorough background check, all pursuant to the Department's policies. There is no evidence that the screening revealed anything to suggest that Officer Coyne would engage in sexual assault.

Ms. Schneider asserts that the hiring and background check policies were inadequate because there were several "red flags" in the investigation of Officer Coyne's background that were disregarded.  Specifically, she identifies a nearly two-year gap in Officer Coyne's employment in the late nineties, before he became a police officer, the fact that he had nine different addresses in ten years, and the areas of concern noted on the psychological evaluation. She further argues that Officer Coyne's personnel file from the Florida Department of Environmental Protection was not obtained.[15]

In addition, she contends the Department failed to seek or obtain other pertinent information.  There was no continuing background check between the date Officer Coyne was hired through the date that he began working.  This would have revealed the groping incident involving Ms. Lyon.  Ms. Schneider also contends that the following were deficiencies in the Department's background investigation of Officer Coyne: (1) failure to obtain Officer Coyne's credit reports; (2) failure to check any internet or social media reviews of Officer Coyne (such as Facebook or Linked In); (3) failure to investigate Officer Coyne's gap in employment; (4) failure to inquire about Officer Coyne's wife's maiden name, previous marriages or long-term relationships, siblings, or "his wife's father, who was in law enforcement;" and (5) failure of Chief Gardner to personally interview Officer Coyne or to personally discuss Officer Coyne's qualifications with the Mesa County Sheriff.[16]  She offers no evidence, however, as to what

---

[15] As noted, the record shows that this employer refused to provide information to the Department.  Had this been obtained, the  information would have revealed was a single disciplinary investigation in which the complaint was found to have been "not sustained."

[16]Ms. Schneider also appears to argue because other officers were terminated or resigned in lieu of termination as a result of improper conduct from 2005 to 2010, it should have put the decisionmakers on notice that the hiring procedures were inadequate.  This does not satisfy Ms.

investigation into these areas would have revealed, or whether such information would have changed the hiring decision.

### (a) Causation

Other than the failure to discover the incident involving Ms. Lyon, there is no evidence as to how the "red flags" or avoidance of the alleged omissions in Officer Coyne's background investigation would have revealed a risk that Officer Coyne might rape citizens such as Ms. Schneider.  As to areas of inquiry that were not explored, there is no showing of what information could have been but was not discovered and how it would have been significant.

Turning to the incident involving Ms. Lyon, it occurred after Officer Coyne was hired but before he began work.  Thus, to be significant the evidence would have to show that this information could have changed the hiring decision or resulted in oversight or terms of employment that might have prevented Officer Coyne's acts.  There is no showing with regard to either aspect.

In the absence of any showing of how the alleged deficiencies in the hiring and screening process affected the decisions or events occurring thereafter, Ms. Schneider has not established a causal connection between alleged inadequate pre-employment screening police officer candidates and her injury.

### (b) Individual Defendants - Knowledge of Risk

---

Schneider's burden to identify a particular deficiency in the hiring process that was both inadequate and causally connected to her specific injury.  In addition, the other officers' alleged misconduct, such as consensual extra-marital relationships, driving offenses, and intoxication, has no constitutional implications.  The only officer whose conduct could amount to a constitutional violation similar to that allegedly suffered by Ms. Schneider is Officer Z, and Ms. Schneider has not provided any information about deficiencies in how he was hired that would have put the Defendants on notice of inadequacies in the process.

In addition, Ms. Schneider must show that the individual decisionmakers were deliberately indifferent to the risk associated with failing to obtain the missing information or to investigate further the alleged "red flags."  There is no evidence from which a reasonable jury could infer that any of the individually named Defendants knew that hiring Officer Coyne despite his multiple changes of addresses, long-ago gap in employment, potential inability to get along with coworkers, and failure to continue the background check after hire or investigate his credit report or social network presence created a substantial risk of injury to someone like Ms. Schneider.  Nothing in Officer Coyne's record or background suggested the need to search further or that these sources would be likely to reveal dangerous tendencies not otherwise indicated in the records check, personal interviews, and other examinations and screenings.

### (c) City - Deliberate Indifference

Similarly, to the extent that the Department's usual hiring and screening procedure and Chief Gardner's hiring decision can be attributed to the City as an official custom or policy, Ms. Schneider must show that the need for greater action or vigilance was so obvious that the failure to do so can be considered municipal deliberate indifference.  The evidence is insufficient in this regard.  There is no evidence to show that the failure to obtain such information in the past had led to the hiring of officers who sexually assaulted citizens or that it was obvious that investigating such areas would obviously reveal that an applicant could be a sexual predator.  As noted above, there is no evidence as to what this additional investigation would have revealed, much less that the need for such investigation was obvious.

**2.** **Training** (asserted against Chief Gardner, Interim Chief Camper, Deputy Chief Zen, Sgt. Baker, the City)

With respect to training, the only specific deficiency identified by Ms. Schneider is the

failure of the responsible individuals to implement a training program regarding the "impropriety of engaging in personal relationships with women whom (sic) were met or contacted while the officer was engaged in official police business."  She further contends that the decisionmakers were on notice of the need for such training because of the alleged widespread "custom" of officers engaging in extra-marital affairs[17] with women they met in the course of their duties.

### (a) Causation

Even if Ms. Schneider could establish that the training in this regard was inadequate and amounted to a custom or policy of either the individuals or the City, the evidence does not show any causal connection between the failure to train officers with regard to consensual extra-marital relationships and the criminal, non-consensual assault at issue here.[18]  Engaging in a consensual extra-marital relationship is neither criminal nor unconstitutional conduct, and it is fundamentally different from the facts in this case.  Ms. Schneider denies that she had any consensual physical or sexual contact with Officer Coyne at all or that she indicated in any way that she sought a relationship with him.  Thus, the training advocated would not have addressed the circumstances in this matter.

As support for her contention that there is at least an issue of fact as to whether the Defendants' alleged tolerance for officers having consensual sexual relationships with women

---

[17]The Court questions whether the conduct of two officers amounts to a "custom" and whether either officer came into contact with the women with whom they had relationships in the course of their duties but will proceed with the analysis nonetheless.

[18]The fact that Officer Coyne apparently used his position as a police officer to assault vulnerable women that he met in the course of his official duties does not, standing alone, show that the type of training the Plaintiff suggests would have reduced the risk that he would commit a crime of this nature.

contacted while on duty could amount to a policy or custom that caused the deprivation of her constitutional rights, Ms. Schneider cites to *Valanzuela v. Snider*, 889 F.Supp. 1409 (D.Colo. 1995).   Although the facts of *Valanzuela* are similar in nature, they are different by significant degree from those in this case.

In *Valanzuela,*  a police officer was accused of picking up the plaintiff when she was intoxicated and sexually assaulting her during the course of his duties.  On several occasions prior to the incident, the officer had been accused of using his authority as a police officer to sexually assault women.  In one incident,  he was accused of rape and failed a polygraph test. He had an improper relationship with a prostitute and 13-year old runaway;  his supervisors knew that he had made advances with regard to other young girls in the course of his duties. There were reports that the officer frequently would pick up women or girls that he came into contact with while on duty, let them ride with him during his tour of duty, and then transfer them to his own car when he finished his shift.  He received only minimal discipline for this conduct. Based on these facts, the court denied summary judgment to the municipality, finding a genuine issue of material fact as to whether a policy existed which permitted known sexually and legally inappropriate behavior to continue without discipline resulted in the plaintiff being deprived of her constitutional rights.

The incidents that the Plaintiff identifies in this case do not demonstrates a tolerance for egregious and alarming behavior of the degree or frequency shown in *Valanzaula*.  Other than the prior incident involving Officer Coyne, discussed further below, only the incident involving Officer Z involves non-consensual, potentially criminal, conduct implicating constitutional rights.  As with Officer Coyne, Officer Z was immediately placed on leave and an investigation

was launched.  This does not amount to an unaddressed repeated pattern of misconduct similar to *Valanzuela*.

### (b) Individual Defendants - Knowledge of Risk

As to the individual Defendants, the evidence must demonstrate that the supervisors knew that failure to train officers not to have consensual off-duty relationships with women met in the course of their duties created a substantial risk that an officer would commit a criminal sexual assault under color of law.  There is no evidence that any of the Defendants had such knowledge.

### (c) City - Deliberate Indifference

As to the City, Ms. Schneider must come forward with evidence which, if credited by a jury, would create an inference that the City had actual or constructive notice that the failure to provide training in this regard was substantially certain to result in an assault under color of law such as that occurring here.  Again, given the difference between lawful but improper off-duty consensual relationships and illegal sexual assault, the need for such training is far from obvious. In addition, there is no evidence of previous repeated episodes of criminal sexual misconduct committed under color of law such that the policymakers would have been aware of the need for additional training.

**3.** **Supervision** (asserted against Chief Gardner, Interim Chief Camper, Deputy Chief Zen, Sgt. Baker, and the City)

With respect to supervision, the primary inadequacy Ms. Schneider identifies is the Department's practice of maintaining confidentiality with regard to internal investigations or allegations of wrongdoing involving sexual improprieties.  She maintains that had Officer Coyne's supervisors been aware of the circumstances underlying the discipline imposed for the

incident involving Ms. Whyte-Begay, Officer Coyne would have been subject to greater supervision.

### (a) Causation

This is a closer question than is apparent with regard to hiring and training.  Logically, it would make sense that if Officers Coyne's supervisor had known about the reasons for his probation, that some restrictions might have been imposed.  But the difficulty with that assumption is that it suggests that if Officer Coyne's supervisors knew about his off-duty conduct, they would have been able to control both his on-duty and his off-duty conduct.  Although the evidence is sufficient for a *prima facie* showing that Officer Coyne was acting under "color of law" when viewed from a reasonable victim's perspective, from the position of a supervisor, Officer Coyne was off-duty. There is no evidence that any of Officer Coyne's supervisors were aware or had notice that he intended to go to her home after he left work.[19]  In other words, he was not under official supervision at the time.  Thus, even if Officer Coyne's supervisors knew of the prior incident with Ms. Whyte-Begay, there is no evidence that any supervision would have prevented Officer Coyne from committing an intentional, criminal assault while off-duty.

If Officer Coyne's direct supervisors had known of the nature of Ms. Whyte-Begay's complaint, Ms. Schneider suggests that if Coyne's direct supervisor, Sgt. Baker "would have been able to . . . prevent Officer Coyne from initially and subsequently contacting distraught female citizens of Grand Junction."  The logical extension of this restriction would be that

---

[19] The hearsay within hearsay statement of Officer Coyne (that his supervisor said he would "cover for him"), if admissible, does not show actual knowledge in this regard.

Officer Coyne would have been barred from all police interaction with women, or at least distraught women, although it is unclear how such a determination would have been made. There is no evidence that demonstrates that such a restriction was viable or how it could have been implemented.

Alternatively, Ms Schneider suggests that had Sgt. Baker known of the underlying details of the incident involving Ms. Whyte-Begay, he "could have taken action that would have prevented the deprivation of Plaintiff's substantive due process rights when (1) Coyne approached him about a woman whom he met while engaged in official police business contacting him regarding a personal relationship . . . and (2) Officer Coyne's 'strange' behavior when he was investigating the emergency call made by Plaintiff." Ms. Schneider does not explain how a different response to Officer Coyne's statement that a woman was contacting him in an apparent attempt to have an inappropriate personal relationship would have changed his conduct with Ms. Schneider, or why such statement should have alerted Sgt. Baker of potential unlawful sexual assault by Officer Coyne. Similarly, the evidence of Sgt. Baker's dissatisfaction with Officer Coyne's handling of the investigation of Ms. Schneider' son does not constitute either a warning of future unlawful behavior, nor does it appear that corrections of Officer Coyne's such conduct would have prevented his unlawful conduct. Sgt. Baker's objections to Officer Coyne's conduct pertained to gathering evidence, such as neglecting to take the cell phone, and his resistance to fully investigating the matter. Although with perfect hindsight one might see those actions as a pretext to contact Ms. Schneider, at the time that they occurred, such oversights did not reasonably suggest that Officer Coyne would use his role in the investigation of Ms. Schneider's son as a means to sexually assault her. More importantly, the evidence does

not show that correction of this behavior likely would have prevented the assault.

### (b) Individual Defendants - Knowledge of Risk

Ms. Schneider must show that the responsible officials knew that maintaining confidentiality around internal affairs investigations and discipline relating to sensitive or sexual matters created a substantial risk of constitutional injury of the type alleged here.  She offers no evidence in this regard.

### (c) City - Deliberate Indifference

In addition, to impose liability on the City for this alleged policy, she must show that it had actual or constructive notice that the confidentiality policy regarding internal affairs and discipline substantially certain to result in an officer sexually assaulting a citizen pursuant to his badge of authority as a police officer.  Again, there is no evidence that any similar incidents had ever resulted from the confidentiality policy or any other evidence that would be sufficient to show that the decisionmakers were on notice of a need to disclose such information more broadly.  In addition, given the attenuated relationship between Officer Coyle's illegal act and the reasonable scope of supervision it is not obvious that failing to disclose the details of the previous incident would result in such an assault.

**4.      Investigation of Prior Complaint** (asserted against PSA Dyer**,** Deputy Chief Zen, Chief Gardner and the City)

Ms. Schneider alleges that the allegedly inadequate investigation of Officer Coyne resulting from Ms. Whyte-Begay's complaint amounted to an action or policy that caused her constitutional deprivation.[20]  Assuming, without deciding, that PSA Dyer's investigation

---

[20]With respect to the criminal investigation by the Sheriff's Department, there is no evidence that any Defendant interfered with or influenced that investigation or the decision by

amounted to a policy (thereafter ratified by Chief Gardner and attributable to the City), the Court turns to the alleged deficiencies in that process.

Ms. Schneider contends the internal affairs investigation was inadequate because PSA Dyer relied on Sgt. Stoffel's criminal investigation and did not interview Ms. Whyte-Begay himself, did not do another background check that might have revealed the post-hire groping incident involving Ms. Lyon, and relied on the District Attorney's decision not to prosecute and on Officer Coyne's passing a polygraph.[21] With respect to the failure to interview Ms. Whyte-Begay or to undertake additional investigation, Ms. Schneider does not identify what PSA Dyer would have learned that was not contained in the interviews conducted by Sgt. Stoffel and other materials in the investigation file. As to her remaining contentions, they are basically an assertion that PSA Dyer and Chief Gardner should have interpreted the evidence before them differently than they did and made a different decision about discipline; that issue is discussed below.

### (a) Causation

In the absence of any evidence as to how the alleged omissions in the investigation were

---

the District Attorney not to prosecute. Ms. Schneider's claims in this regard appear to be based only on the internal affairs investigation conducted by PSA Dyer.

[21]Ms. Schneider asserts that the inadequate investigation is shown by the Department's alleged retaliation against persons, such as herself and Ms. Whyte-Begay, who reported misconduct by Grand Junction police officers. Even giving her the benefit of all favorable inferences, Ms. Schneider's evidence does not show any such retaliation. There is no evidence of any retaliatory adverse action taken against Ms. Whyte-Begay. The false reporting investigation of Ms. Schneider was pursued by the Sheriff's Department, not the Police Department. Moreover, this evidence is immaterial as Ms. Schneider still does not explain what an allegedly better investigation would have revealed or whether the decisionmakers were deliberately indifferent.

material, Ms. Schneider cannot carry her burden to show that her injury was caused by the "policy" of inadequately investigating claims of misconduct.

### (b) Individual Defendants - Knowledge of Risk

To establish liability against PSA Dyer, Deputy Chief Zen, and Chief Gardner individually, there must be evidence sufficient for a reasonable jury to infer that these individuals knew that failing to interview Ms. Whyte-Begay a second time and failing to re-investigate Officer Coyne's work history at the Sheriff's Department presented a substantial risk that the investigation would be incomplete and that this created a risk of a citizen being sexually assaulted by Officer Coyne..  As noted above, there was nothing about Officer Coyne's record or history that suggested further review was needed, nor is there any evidence of an obvious deficiency in the evidence from Ms. Whyte-Begay such that a jury could conclude these individuals acted with the culpable mental state to impose liability.

### (c) City - Deliberate Indifference

For the reasons discussed above, the evidence is also insufficient to establish that the City was on notice of a need to change its policies with respect to internal affairs investigations.

**5.    Discipline of Officer Coyne** (asserted against Chief Gardner, Deputy Chief Zen, PSA Dyer, and the City)

Finally, Ms. Schneider alleges that the allegedly inadequate discipline of Officer Coyne resulting from Ms. Whyte-Begay's complaint amounted to an action or policy that caused Ms. Schneider's constitutional deprivation.  As noted above, this claim is based on her assertion that the officials should have believed Ms. Whyte-Begay's account of what occurred and terminated Officer Coyne's employment.  Therefore, the issue is whether the failure to terminate Officer Coyne's employment based on the evidence revealed in the investigation of Ms. Whyte-Begay's

complaint caused Ms. Schneider's constitutional harm and whether the relevant decisionmakers, ultimately Chief Gardner, were deliberately indifferent in this regard.

**(a) Causation**

Although discharging Officer Coyne instead of placing him on probation might well have prevented him from coming into contact with Ms. Schneider, which establishes cause-in-fact, it does not necessarily demonstrate proximate cause.[22]  Nonetheless, even giving Ms. Schneider the benefit of all favorable inferences in this regard, she must still establish the other elements of her claim.

**(b) Individual Defendants - Knowledge of Risk**

Even if causation was shown, there must also be evidence demonstrating that Chief Gardner and the other responsible officials had a culpable state of mind in making the decision to retain Officer Coyne.  Although in hindsight the similarities between what happened with Ms. Whyte-Begay and  Ms. Schneider reinforce Ms. Whyte-Begay's account of the incident, the deliberate indifference analysis is based on what Chief Gardner knew at the time he reviewed the Whyte-Begay investigation made a decision as to Officer Coyne's discipline.  At that time, Chief Gardner was presented with Officer Coyne's apparently clean record and a single *off-duty* incident with both parties admitting to some consensual sexual contact, disputed non-consensual sexual activity, ambiguous physical evidence and a polygraph test showing no deception with respect to the disputed facts.  In addition, a district attorney was unwilling to prosecute the matter as a crime.

---

[22]Officer Coyne may have been able to meet and thereafter create an opportunity to assault Ms. Schneider because of his position as a police officer, but it is questionable that continuing his job as a police officer is what *caused* him to assault her.

As serious as the incident was, the evidence does not show that the Chief **knew** that retaining Officer Coyne **would create a risk** of a subsequent sexual assault under color of law. Even construing the evidence in the light most favorable to Ms. Schneider, at most it suggests that Chief Gardner should have recognized possible risks for future non-consensual sexual behavior by Officer Coyne.  Put differently, at most Chief Gardner was negligent in not recognizing a risk, as compared to deliberate in ignoring it.  Negligence is insufficient to establish a substantive due process claim.

Moreover, Chief Gardner did not simply overlook the incident, which might have encouraged a wayward officer to believe that misconduct would be tolerated.  Unlike cases such as *Valanzuela*, the discipline was substantial and direct, showing that the misconduct was taken seriously.  Officer Coyne received a pay cut and was placed on probation; this meant that he could be summarily terminated for any further infraction.  It was designed to act as a disincentive for Officer Coyle to engage in any inappropriate off-duty sexual activity.

### (c) City - Deliberate Indifference

For the foregoing reasons, the evidence is insufficient to support the inference that the City had actual or constructive notice that the failure to terminate Officer Coyne's employment was substantially certain to result in a constitutional violation of the type inflicted upon Ms. Schneider.

## C.      Motion to Seal

The Defendants seek to keep under seal or to redact any reference to the disciplinary records of former City of Grand Junction police officers, as contained in the Plaintiff's

34

Memorandum in support of her Response Brief, Statement of Facts, and in Exhibits 61-66.[23]  The

Defendants note that these individuals are not parties or participants in this litigation, they have

privacy interests in the records relating to the investigations and discipline they received, and

that these records contain sensitive personal information.  The Defendants argue that release of

this information could cause embarrassment and damage to these individuals' reputations.  The

Defendants contend that such harm could be reduced by redacting the names of these individuals

from the brief and certain exhibits but that other information should remain under seal.

        The names of the individual officers whose conduct and discipline may bear on the issues

in this matter are immaterial and, therefore, need not be revealed in this order or in the briefs or

exhibits.  In addition, Exhibits 61-66 contain private information relating to nonparties, release

of which could cause harm to their privacy interest and reputations.  It does not appear that a less

restrictive measure, such as redaction, would sufficiently protect these interests.  Moreover, to

the extent the information contained in these exhibits is material, similar evidence is contained in

other exhibits in a form that does not implicate the privacy interests of these individuals.

        Therefore, with respect to Ms. Schneider's Memorandum, Exhibit List (Appx. A to

Memorandum), and Statement of Facts (Appx. B to Memorandum), these documents shall

remain under seal but Ms. Schneider shall file redacted versions with the names of non-party

---

        [23]At this time, Ms. Schneider's entire Memorandum in support of her Response Brief and
all exhibits are under seal.

Grand Junction police officers removed.  Exhibits 61-66 shall remain under seal.  All other exhibits shall be unsealed.

**IT IS THEREFORE ORDERED**

(1)     The Defendants' Motion for Summary Judgment (**#85**) is **GRANTED**.

(2)     The Clerk shall enter judgment in favor of the Defendants and against the Plaintiff on all claims.

(3)     The Defendants may have their costs.

(4)     The Defendants' Motion to Seal (**#108**) is **GRANTED IN PART AND DENIED IN PART**.  The Plaintiff's Response Brief Memorandum, Exhibit List (Appx. A to Memorandum), and Statement of Facts (Appx. B to Memorandum) and Exhibits 61-66 shall remain under seal.  Ms. Schneider shall file redacted versions of the Response Brief Memorandum, Exhibit List, and Statement of Facts within ten days of the issuance of this order.  All other exhibits shall be unsealed.

Dated this 13th day of February, 2012.

BY THE COURT:

Marcia S. Krieger
United States District Judge